IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| PAUL A. SCHOLZ, | ) | |
| | ) | No. 34919-5-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON STATE PATROL, AN | ) | OPINION PUBLISHED |
| AGENCY OF THE STATE OF | ) | IN PART |
| WASHINGTON | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Paul Scholz appeals the summary judgment dismissal of a

disability discrimination claim through which he sought damages for the termination of

his employment by the Washington State Patrol.[1]  The trial court concluded that his claim

was barred by collateral estoppel on account of a labor arbitration determination that his

---

[1] Mr. Scholz also appealed dismissal of a breach of implied contract claim and assigned error to that dismissal in his opening brief.  He devoted no argument to the issue in his brief nor did he address it at oral argument, however, and we consider it abandoned.

employment was terminated for just cause. Mr. Scholz challenges whether the labor

arbitration presented an issue identical to any issue presented by his disability

discrimination claim, argues that applying preclusive effect will work an injustice, and

argues that the arbitrator's decision reveals an erroneous finding on a material fact.

As a matter of first impression, we hold that with one modification, three special

considerations applied in determining whether facts determined in an administrative

hearing have preclusive effect should also apply to facts determined in an arbitration

hearing. Finding that all of the elements required to apply collateral estoppel are present,

we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Paul Scholz sued the Washington State Patrol (Patrol) for terminating his

employment based on the results of an investigation of his involvement in a semitruck

pileup on a winter morning in January 2012. Then-Officer Scholz had stopped his patrol

vehicle in the right lane of westbound Interstate 90 (I-90) on Snoqualmie Pass in bad

weather and had been speaking with the driver of a semitruck parked in the lane to his

left. When he found himself at the front end of what quickly became a six-semitruck

pileup, Officer Scholz was in fear for his life.

In his complaint for damages, Mr. Scholz alleges that within hours of the accident

and despite his obvious emotional distress—later described by his expert as an acute

anxiety disorder—he was taken to the Patrol's scale house and was questioned about the

2

accident. His answers led to an accusation that he lied and to a formal investigation by the Patrol's Office of Professional Standards. Following completion of the Patrol's investigation, his employment was terminated.

Mr. Scholz's complaint asserted a claim for disability discrimination in violation of chapter 49.60 RCW. A little less than a year after it was filed, the Patrol moved for summary judgment, contending that his discrimination claim was precluded by a 2014 labor arbitration determination that the Patrol terminated Mr. Scholz's employment for just cause. Mr. Scholz responded that the 2014 arbitration decision should not be given preclusive effect because the issue decided in the arbitration was not identical to issues presented by the lawsuit, and applying preclusive effect would work an injustice.

With the context framed, we delve into more detail about the arbitration.

*The labor arbitration*

At the conclusion of the Patrol's investigation of the pileup, it terminated Mr. Scholz's employment based on untruthfulness and violations of other Patrol rules. The Professional and Technical Employees Local 17 (Union) and Patrol's collective bargaining agreement (Agreement) provides in article 29 that permanent employees shall only be disciplined for "just cause." Clerk's Papers (CP) at 77. "Discipline" as used in the Agreement includes discharges. Mr. Scholz's Union grieved the termination, which was denied. The Union and the Patrol then requested arbitration under the Agreement

3

and mutually selected an arbitrator. Arbitration was conducted over four days. The following facts are taken from the arbitrator's decision.

In Mr. Scholz's position as a commercial vehicle officer for the Patrol, his main responsibility was to inspect and weigh vehicles at the Cle Elum scale house. In winter months, when snowy conditions required the use of tire chains, he was authorized to enforce chain requirements in the Snoqualmie Pass and Blewett Pass areas. As a limited authority officer, he was not empowered to enforce the rules of the road, such as citing drivers for speeding.

Bad weather and bad road conditions existed on the morning of the pileup. Officer Scholz was sent out to conduct chain enforcement on I-90 in an area east of Snoqualmie Pass. He was specifically directed to watch for drivers of trucks parked and chaining up improperly on the right shoulder of the westbound lanes and to instruct them to move a few miles ahead to a safer, designated chain-up area. He encountered two large semitrucks parked on the shoulder at a location that was a particularly dangerous place to chain up because it was approached on a curve, making it difficult for an approaching driver to see the semis until the driver was almost upon them. He turned on his emergency lights and came to a stop in the right lane next to the two stopped semis.

What happened as Officer Scholz approached the two semis and stopped was disputed. A semitruck with double trailers being driven by Rigoberto Flores-Garcia was traveling westbound at the same time as Officer Scholz, and there is some evidence that

upon stopping and getting out of his vehicle, Officer Scholz flagged Flores-Garcia to stop. For whatever reason, Flores-Garcia did stop in the lane to the left of, and next to, Officer Scholz's vehicle, thereby blocking the second lane for westbound traffic. Leaving his motor running and his emergency lights flashing, Officer Scholz walked around the cab of the Flores-Garcia vehicle to tell him the road was extremely icy and he needed to slow down.

As Officer Scholz started to walk back toward his patrol vehicle, a fourth semi-truck came along at high speed and crashed first into the patrol vehicle, and then into the two semitrucks on the shoulder before coming to a stop mostly in the right lane. Within moments or even seconds, two more westbound commercial vehicles came upon the scene and crashed into the four stopped vehicles, creating a massive pileup that totally blocked westbound traffic. Hearing the crashing sounds but with his visibility blocked by the cab of the Flores-Garcia truck, Officer Scholz—afraid of being hit and killed—ran to the safety of a snowbank in the median.

Trooper Darren Wright arrived on the scene within minutes of the collision and was told by Officer Scholz that he had parked in the right lane, next to the semitrucks parked on the shoulder, and that he had flagged the Flores-Garcia vehicle down for speeding. Asked how he was doing, Officer Scholz told Trooper Wright and other arriving officers that he was "okay," "not hurt," and was not injured, but the officers described Scholz as shaken up and "kind of" or "a little bit" in shock. CP at 35. When

5

his immediate supervisor arrived, Officer Scholz was upset and crying and hugged her— an unusual gesture for him.

Sgt. Kevin Overbay was dispatched from Wenatchee to investigate and arrived at the Cle Elum scale house a couple of hours after the accident, where he interviewed Officer Scholz. When Sgt. Overbay asked what had happened, Officer Scholz told the sergeant he had parked on the shoulder, behind the two semitrucks whose drivers were chaining up. He also told the sergeant that he had not flagged down Flores-Garcia but had merely signaled for Flores-Garcia to slow down by pumping his arms up and down, palms down. When Sgt. Overbay pressed Officer Scholz on whether he had stopped in the right lane of traffic, Officer Scholz said he had been "completely on the shoulder." CP at 53. Officer Scholz's statements to the sergeant were overheard by others. Later that day, investigators at the scene reported to Sgt. Overbay that based on the tire marks, Officer Scholz's vehicle had been parked in the right lane, not on the shoulder.

Within a few days after the pileup, Officer Scholz went to a medical clinic and saw a physician's assistant and a counselor. He had three counseling sessions with the counselor and within a few weeks of the pileup saw a psychologist, Dr. James W. Cole, who treated him for acute stress disorder.

Officer Scholz was placed on special assignment at home and an extensive investigation ensued. Officer Scholz was reinterviewed in May and September 2012. In the May interview, which took place after the investigation called into question his

statements to Sgt. Overbay, Officer Scholz denied ever having told the sergeant that he parked on the shoulder. He admitted parking in the right lane. But he insisted that his position relative to Flores-Garcia had left ample room for travel between their vehicles, drawing a sketch to support his explanation. The arbitrator characterized Officer Scholz's description and depiction of I-90 and the vehicles' positions as "clearly untruthful." CP at 58. Officer Scholz also insisted in the May interview that he was still inside his patrol vehicle when he merely motioned with a finger for Flores-Garcia to slow down, telling interviewers that Flores-Garcia decided to stop in a traffic lane on his own. He claimed not to recall having told Sgt. Overbay that he motioned Flores-Garcia to slow down by pumping his arms up and down.

In his final, September interview, Scholz stuck by his statements in May.

Investigators found violations by Officer Scholz of four regulations, the most serious being the prohibition of untruthfulness. Following a *Loudermill*[2] predetermination hearing, the Patrol issued a final determination letter citing the same violations and terminating his employment.

Other matters were factually and legally at issue in the labor arbitration, but relevant for our purpose is only whether in deciding there was "just cause" for Officer

---

[2] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

Scholz's termination, the arbitrator necessarily determined that he had been intentionally untruthful in making false statements and that his evidence of a mental disorder did not explain or excuse the untruthfulness.

Since the parties' Agreement did not define "just cause" and the Patrol's process for determining just cause had not been negotiated with the Union, the arbitrator relied on labor arbitration common law, citing a currently favored four element test for just cause:

1. That the grievant had notice of the rules to be followed and the consequences of noncompliance;

2. That the grievant engaged in the misconduct of which he/she is charged;

3. That there was procedural regularity in the investigation of the misconduct; and

4. That the employer applied the discipline in a reasonable and even-handed manner, considering the seriousness of the proven offense(s), the employee's disciplinary record and any aggravating or mitigating circumstances, using progressive discipline when appropriate.

CP at 48 (emphasis omitted). The arbitrator explained that where untruthfulness was alleged, she would apply the standard of clear and convincing proof, "because of the serious consequences of being accused of untruthfulness." *Id.*

As summarized by the arbitrator, the Union's defense to the charge that Scholz was untruthful was that "[his] state of mind after the traumatic event caused him to be unclear or mistaken in his explanations about what had happened." CP at 43. The arbitrator's decision recounts Dr. Cole as diagnosing acute anxiety disorder because of the trauma:

8

> He said such trauma can impact the individual's perception of the traumatic incident itself as well as his ability to communicate about the trauma. A traumatized individual may say things they wish they had been able to do or they may be somewhat confused about what had happened.

CP at 44. With a citation to the transcript of the arbitration hearing, she said that according to Dr. Cole, "for Scholz, the intense anxiety symptoms lasted about a month. His condition finally abated just short of the point at which the diagnosis would have changed to post-traumatic stress disorder (PTSD)." CP at 45.[3]

Mr. Scholz testified during the hearing that he had always dealt with a learning disability, dyslexia, and that it impaired his communication when under stress, which might explain inconsistencies between what he told officers at the scene of the pileup and what he later told Sgt. Overbay.

Based on this evidence, the arbitrator concluded "it was possible Scholz was still suffering from emotional trauma and confusion during the meeting at the scale house. It is possible that his memory was unintentionally inaccurate or he misspoke because of a

---

[3] Elsewhere, and without citation to the hearing transcript, the arbitrator's decision states that Scholz's counselor and Dr. Cole both expressed the opinion that "Scholz was suffering from post-traumatic stress." CP at 44. Since the arbitrator did not use the word "disorder" in recounting that testimony, the witnesses apparently described only stress following trauma, not PTSD.

Our record does not include the transcript of the labor arbitration hearing, nor was it needed. We are concerned only with the arbitrator's final, binding factual determinations. Our reason for noting citations to the transcript is that Mr. Scholz argues on appeal that the arbitrator's decision is ambiguous as to whether Dr. Cole diagnosed him with PTSD. Her decision is not ambiguous. Her use of only the single citation to the transcript contributes to the clarity of her finding that Dr. Cole never diagnosed PTSD.

life-long communication difficulty that became aggravated at that time because of stress."

CP at 57. But the arbitrator found that self-serving inaccuracies in Officer Scholz's later

interviews were not caused by anxiety, stress, or PTSD:

> Clearly, however, the Grievant was no longer suffering from the stress of the incident on May 31, 2012, when he was interviewed. . . . Dr. Cole had released him as a patient at least two months earlier without diagnosing long-term PTSD, because the Grievant's symptoms had ended within 30 days of the January 19 incident. In spite of the passage of time and the improvement in his emotional condition, however, Scholz seemed to dig in his heels and defend the inaccurate statements he had made to Sgt. Overbay on January 19, though he had had ample opportunity to reflect about the events and explain the entire incident truthfully to the interviewers.

CP at 57-58 (citation omitted). She characterized his claim in May and September that he

merely signaled with a finger from his patrol car that Flores-Garcia should slow down as

"carefully calculated to show that driver Garcia was responsible for the eventual

roadblock and that Scholz did nothing that contributed to such blockage." CP at 59.

Among the arbitrator's articulated reasons for finding the Patrol had just cause for

terminating Officer Scholz's employment were her factual determinations that Mr.

Scholz had been intentionally untruthful in making statements and that his evidence of a

mental disorder did not explain or excuse his untruthfulness.

*The summary judgment decision*

Having reviewed the parties' submissions on the matters addressed in the labor

arbitration and heard the argument of counsel, the trial court granted the Patrol's motion

to dismiss the disability discrimination claim.  Mr. Scholz moved for reconsideration,

arguing that the trial court mistakenly believed he was not suffering from PTSD at the

time he gave his May and September statements.  He pointed to the following statements

made in a declaration he filed in opposition to summary judgment:

> Immediately following the incident I was disabled and suffering from
> PTSD, and continued to suffer during the investigation.  I treated with Dr.
> James Cole, Ed.D. for one year due to the trauma I suffered and diagnosed
> me with Acute Stress Disorder and Anxiety Disorder.  I was diagnosed with
> PTSD in October of that year by Dr. Freedman, and he recommended
> additional counseling for more months.
> [At the arbitration hearing, t]here was never any questioning or
> statements regarding the state of my disability during the times I was
> providing the statements, and whether the employer considered my
> disability at the time it adjudged me untruthful.

CP at 103-04.  This is the only mention in the record on appeal of a "Dr. Freedman."  No

evidence of Dr. Freedman or his opinions was presented in the labor arbitration hearing.

The court considered but denied the motion for reconsideration.  Mr. Scholz

appeals.

## ANALYSIS

Collateral estoppel, modernly referred to as issue preclusion, bars relitigation of an

issue in a subsequent proceeding involving the same parties.  *Ullery v. Fulleton*, 162 Wn.

App. 596, 602, 256 P.3d 406 (2011).  It is distinguished from claim preclusion, or res

judicata, in that, instead of preventing a second assertion of the same claim or cause of

action, it prevents a second litigation of issues between the parties, even though a

different claim or cause of action is asserted. *Id*. "Collateral estoppel is concerned only with limiting the relitigation of factual issues." 14A KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 35:33, at 552-53 (2d ed. 2009).

Issue preclusion applies only if (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding; (2) the earlier proceeding ended in a judgment on the merits; (3) the party against whom issue preclusion is asserted was a party to, or in privity with a party to, the earlier proceeding; and (4) application of issue preclusion does not work an injustice on the party against whom it is applied. *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 307, 96 P.3d 957 (2004). An important clarification of the first requirement that an issue was "decided" in the earlier proceeding is that the issue must have been "actually litigated and necessarily determined" in that proceeding. *Shoemaker v. City of Bremerton*, 109 Wn.2d 504, 508, 745 P.2d 858 (1987). Mr. Scholz concedes that only the first and fourth required elements are at issue.

Additional factors are considered when issue preclusion is based on the decision of an administrative agency, and Mr. Scholz argues they should also be considered when issue preclusion is based on the decision of an arbitrator. They are (1) whether the agency acted within its competence, (2) the differences between procedures in the administrative proceeding and court procedures, and (3) public policy considerations.

*Christensen*, 152 Wn.2d at 308. The Patrol disputes the factors' application to arbitration.

The three additional factors do not increase the showing required before applying issue preclusion, so much as they point to considerations relevant to the fourth required element (the "injustice" element) when the earlier proceeding was a nonjudicial administrative determination. Given relevant similarities between administrative hearings and arbitration, we largely agree that the factors should be considered here. In *Robinson v. Hamed*, which held for the first time that a party to an arbitration proceeding may be precluded from relitigating the same issue in a subsequent lawsuit, this court described the preclusive effect of issues decided by an administrative agency as a "closely analogous situation." 62 Wn. App. 92, 98, 813 P.2d 171 (1991) (citing *Shoemaker*, 109 Wn.2d 504). And the *Restatement (Second) of Judgments* treats arbitration awards and administrative agency decisions similarly, providing that both types of decisions generally have the same preclusive effect as a judgment, although the procedure in either must exhibit the essential elements of adjudication. RESTATEMENT (SECOND) OF JUDGMENTS §§ 83(2); 84(3)(b) (AM. LAW INST. 1982). We accept the proposition that the three additional factors must be considered where issue preclusion is based on an arbitration, but recast the first "competence" factor as asking whether the issue was within the scope of the reference to arbitration. *Cf.* RESTATEMENT § 84, cmt. d.

13

We review an order granting summary judgment de novo. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). Summary judgment is proper if no genuine issue of material fact remains and the moving party is entitled to a judgment as a matter of law. CR 56(c). We view conflicting evidence in the light most favorable to the nonmoving party. *Lybbert*, 141 Wn.2d at 34. When summary judgment is based solely on collateral estoppel, there is no conflicting evidence—the labor arbitration decision says what it says, and whether it is preclusive is an issue of law that we review de novo. *Ullery*, 162 Wn. App. at 603 (citing *Christensen*, 152 Wn.2d at 305).

We first address Mr. Scholz's argument that there is no identity of issues between the labor arbitration and his disability discrimination claim, turn next to his argument that the application of issue preclusion works an injustice, and finish with his contention that the trial court's decision was based on a material factual error.

I.   IDENTITY OF ISSUES

Mr. Scholz contends that the labor arbitrator did not determine whether the mental disability he suffered as a result of the trauma from the pileup was or was not a "substantial factor" in the Patrol's decision to terminate his employment. Br. of Appellant at 17. It is true that the arbitrator made no determination couched in those terms. But when collateral estoppel is asserted, the second claim is always different from the first. The former claim and the new claim can be expected to raise at least some different ultimate issues. *Island County v. Mackie*, 36 Wn. App. 385, 392, 675 P.2d 607

14

(1984). What matters is whether *facts* established in the first proceeding foreclose the second claim. *Id.*

Mr. Scholz also contends that the arbitrator "*merely* found [he] was untruthful." Br. of Appellant at 17 (emphasis added). This is not true. Elements of "just cause" applied by the arbitrator called on her to assess whether the untruthfulness was culpable or excusable. The second and third elements of "just cause" required a finding of "misconduct," and the fourth required a "reasonable" application of discipline, taking into account the seriousness of the offense and any mitigating circumstances.

Mr. Scholz attempts to persuade us that we cannot know whether the arbitrator affirmed his discharge based on innocent untruthfulness, arguing that she could have—whereas discharging him for an innocent, disability-caused, falsehood would be actionable discrimination. He points to the arbitrator's familiarity with the *Brady*[4] rule.

The *Brady* rule requires prosecutors to disclose exculpatory evidence to criminal defendants, and exculpatory evidence includes whether an involved officer has a record of dishonesty. The arbitrator was familiar with the *Brady* rule and why it makes truthfulness especially important to the Patrol. Her decision even refers to an aphorism reportedly common in the Patrol workforce, "'If you lie, you die.'" CP at 42. But despite the importance of the regulation forbidding untruthfulness, the arbitrator did not

---

[4] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

treat untruthfulness as an automatic basis for discharge, nor has it been treated as an automatic basis for discharging law enforcement officers in other cases.

In *Kitsap County Deputy Sheriff's Guild v. Kitsap County*, a case involving the discharge of a Kitsap County law enforcement officer, Division Two of this court vacated a labor arbitrator's determination, holding that ordering reinstatement of a mentally disabled officer who lied was contrary to public policy. 140 Wn. App. 516, 526, 165 P.3d 1266 (2007). It discussed the importance to law enforcement of an officer's ability to testify free of *Brady* concerns. *Id.* at 522 & n.2. But the Washington Supreme Court reversed the decision. *Kitsap County Deputy Sheriff's Guild v. Kitsap County*, 167 Wn.2d 428, 440, 219 P.3d 675 (2009). The Supreme Court reinstated the arbitrator's "return to duty" order, holding that "[t]he *Brady* rule provides neither an explicit nor a well-defined public policy against reinstating an officer found to be untruthful." *Id.* at 438.

Here, neither the parties nor the arbitrator treated untruthfulness as an automatic basis for being discharged from the Patrol. The Union advanced the defense that Officer Scholz was blameless for any untruthfulness resulting from trauma-induced anxiety. The arbitrator carefully weighed the evidence of mental disability and found that it could excuse the officer's untruthfulness when first questioned by Sgt. Overbay. Whether Officer Scholz's untruthfulness was intentional or whether it was the result of a mental disorder was not only material, it was the most material disputed issue in the arbitration.

16

Turning to the proof required for Mr. Scholz's disability discrimination claim, he would have to show that he was (1) disabled, (2) subject to an adverse employment action, (3) doing satisfactory work, and (4) discharged under circumstances that raise a reasonable inference of unlawful discrimination. *Brownfield v. City of Yakima*, 178 Wn. App. 850, 873, 316 P.3d 520 (2013).

The arbitrator's determination that Mr. Scholz "knowingly and intentionally lied to his superiors during the [Patrol's] investigation in an attempt to minimize his role in causing an unsafe condition to exist on I-90"—a binding determination for purposes of the discrimination lawsuit—is fatal to Mr. Scholz's ability to prove the third element: that he was doing satisfactory work at the time of his discharge. CP at 64.

And Mr. Scholz failed to present prima facie evidence of the fourth element: that he was discharged under circumstances raising a reasonable inference of unlawful discrimination. His discharge for untruthfulness cannot raise such an inference given the binding determination that he was discharged for just cause. He offered no other evidence that his mental health disorder gave rise to a reasonable inference of unlawful discrimination.

Because facts determined in the arbitration make it impossible for Mr. Scholz to establish essential elements of a disability discrimination claim, the required identity of issues is present.[5]

Affirmed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

II.     PRECLUSION WORKS AN INJUSTICE

Washington case law on the injustice element "is most firmly rooted in procedural unfairness. 'Washington courts look to whether the parties to the earlier proceeding received a full and fair hearing on the issue in question.'" *Thompson v. Dep't of Licensing*, 138 Wn.2d 783, 795-96, 982 P.2d 601 (1999) (quoting *In re Marriage of Murphy*, 90 Wn. App. 488, 498, 952 P.2d 624 (1998)). "There is nothing inherently unfair about [issue preclusion] provided the party has the full and fair opportunity to litigate, there is no significant disparity of relief, and all the other requirements of collateral estoppel are satisfied." *Christensen*, 152 Wn.2d at 313.

---

[5] In his brief on appeal, Mr. Scholz distinguishes the Union's claim in arbitration from his disability discrimination lawsuit by relying on several cases that involve *claim* preclusion, rather than *issue* preclusion. *See* Br. of Appellant at 20-23. They are inapposite and need not be further discussed.

The arbitrator found that the parties in the labor arbitration were "thoroughly and competently represented by their respective advocates throughout the hearing." CP at 27. The Patrol called 10 witnesses and offered 21 exhibits, one of which contained all of the Patrol's records from the investigation of the January 2012 accident. The Union called 3 witnesses, one being Dr. Cole, and offered 9 exhibits. Both the Union and the Patrol submitted post-hearing briefs.

Mr. Scholz identifies three procedural differences between arbitration and litigation that he contends work an injustice in his case. He argues first, that the arbitrator did not possess the power to inquire into disability discrimination but was limited to determining the parties' contract rights under the Agreement. Br. of Appellant at 17. Second, he argues that one of the *Restatement*'s essential elements of adjudication was not present, viz., "a formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status." Br. of Appellant at 18 n.49 (quoting RESTATEMENT § 83(2)(c)). Third, he argues that there was a disparity of relief between the reinstatement that Mr. Scholz could obtain through the grievance and the damages recoverable in an action under chapter 46.60 RCW. Br. of Appellant at 18-19. We address his procedural challenges in the order stated.

*Whether the issue decided by the arbitrator was within the scope of the reference to arbitration*

Under Section 32.2A of the parties' Agreement, a grievance is "an allegation by an employee or a group of employees that there has been a misapplication, misinterpretation, or violation of [the parties'] Agreement, which occurred during the term of this Agreement." CP at 80. Article 32 provides several steps for resolving grievances, with the fifth step being the right of the Union to demand arbitration. Under Section 32.3D of the parties' Agreement, an arbitrator's authority is limited to the grievance issue set forth in the original written grievance unless the parties agree to modify it. The section provides that the arbitrator has no authority to add to, subtract from, or modify any of the provisions of the Agreement. Here, the arbitrator's decision states that the parties stipulated to a statement of the arbitration issue: "Was there just cause for disciplining the Grievant? If not, what would the remedy be?" CP at 28.

As already discussed, "just cause" is not defined by the Agreement, and the common law definition applied by the arbitrator included elements that called on her to assess whether Officer Scholz's untruthfulness was culpable untruthfulness. Since the Union defended Officer Scholz's untruthfulness on the basis that it was a result of the mental disorder he was suffering, the factual issue of whether his evidence of a mental disorder explained or excused his untruthfulness was within the scope of the reference to arbitration.

20

*Whether the arbitration procedure included a formulation of issues of
law and fact in terms of the application of rules with respect to specified
parties concerning a specific transaction, situation, or status*

This "essential element of adjudication" identified by *Restatement* § 83(2)(c) is

explained further by the section's comment b:

> [A]djudication of a claim is impossible unless the matter for decision
> includes a legal claim, that is, an assertion by one party against another cast
> in terms of entitlement under substantive law to particular relief, including
> determination of legal status.  For this purpose legal claims include claims
> of entitlement asserted . . . against the government, as . . . when a claim
> based on legal right is prosecuted against the government.  A petition for a
> benefit from the government is not a legal claim unless the agency is
> obliged to grant the petition upon a showing of the existence of conditions
> specified by law.  If a legal claim is involved, however, and if the
> procedures to determine it are substantially similar to those used in judicial
> adjudication, the proceeding is adjudication.  As such, the outcome of the
> proceeding should have the conclusive effects prescribed by the rules of res
> judicata, including conclusiveness as to issues actually litigated.

As applied to administrative proceedings more generally, the comment observes that an

issue of *law* is formulated as it would be in a court "when there is assertion and

controversion of *the meaning of an existing rule as applied to specific circumstances*."

*Id.* (emphasis added).  "An issue of *fact* is so formulated when there is assertion and

controversion of *the occurrence of a legally significant event*."  *Id.* (emphasis added).  "If

an issue has thus been formulated, and if the procedure for resolving it is substantially

similar to that used in judicial adjudication, the agency's determination of the issue

should be given preclusive effect in accordance with the rules of res judicata."  *Id.*

The parties' Agreement formulates issues of law and fact for resolution in an adjudicatory manner. As earlier noted, "grievance" is defined to mean "an allegation by an employee or a group of employees that there has been a misapplication, misinterpretation, or violation of this Agreement, which occurred during the term of this Agreement." CP at 80 (Section 32.2A). Grievances are required to be in writing, and in order to be processed must include the following information:

1. The nature of the grievance;
2. The facts upon which the grievance is based;
3. The specific Article and Section of the Agreement violated;
4. The specific remedy requested;
5. The name of the grievant; and
6. The name and signature of the union steward or staff representative.

CP at 81 (Section 32.2E). Section 32.3B of the Agreement provides that at two steps of the grievance process (meetings with a responsible supervisor or manager, and later with an agency head or designee), Patrol employees provide the Union with a written response to the grievance. If the grievance is not resolved by earlier steps and proceeds to arbitration, the arbitration is limited to resolving the grievance issue, as originally framed or reframed by agreement, solely with reference to the Agreement. The parties' stipulation to the arbitration issue clearly identified the event to which a clearly-articulated claim (the grievance) and clearly-identified rules (terms of the Agreement) were to the applied.

The arbitration procedure included a formulation of issues of law and fact that met the essential element of adjudication described by *Restatement* § 83(2)(c).

*Whether there was too great a disparity of relief between arbitration and an action under 46.60 RCW*

Mr. Scholz argues conclusorily that the disparity between the relief offered by arbitration and the superior court will inevitably lead litigants to forego their arbitral remedies fearing preclusion of their more substantial statutory claim. *See* Br. of Appellant at 18-19. He does not identify what he believes to be the disparity.

The Agreement provides that the arbitrator may not make any award "that provides an employee with compensation greater than would have resulted had there been no violation of the Agreement." CP at 85 (Section 32.3D(1)(d)). This would prevent an arbitral award of general damages but would permit an award of back pay. Mr. Scholz does not dispute that the arbitrator was authorized to reinstate him, a remedy that the Union sought on his behalf.

In *Reninger v. Dep't of Corr.*, 134 Wn.2d 437, 453, 951 P.2d 782 (1998), the Supreme Court, citing *Shoemaker*, reaffirmed that where the presiding officer in an administrative hearing had the authority to restore to an employee his or her job and lost compensation and benefits, the fact that some additional and uncertain damages might be available in court "is not the gravamen of the decision whether to apply collateral estoppel." Any disparity of relief available in the current forum and an earlier one is

23

reviewed "to determine whether sufficient incentive existed for the concerned party to litigate vigorously" in the earlier forum. *Id.* It is where the amount that a party can recover in the earlier forum is "insignificant" that courts reason "the party is not likely to have litigated the crucial issues vigorously and it would be unfair to employ collateral estoppel against the party in future proceedings." *Id.*

As in *Reninger* and *Shoemaker*, the arbitral forum in this case could provide substantial remedies. The Union had reason to litigate the crucial issues vigorously, and did.

III.   ALLEGED MISTAKE OF MATERIAL FACT

Finally, Mr. Scholz argues that the superior court's summary judgment decision was primarily based on "the alleged fact that Officer Scholz was no longer being treated for mental health issues after approximately one month following the . . . multi-vehicle accident." Br. of Appellant at 24. Pointing to statements in his declaration submitted in opposition to summary judgment that he was treated for a much longer period of time, he argues that the fact assumed by the court was a material error.

It is axiomatic that where collateral estoppel applies, the issue that is precluded is not subject to re-argument either on the basis that it was wrongly decided in the first place or on the basis of new evidence. *Cf. Thompson*, 138 Wn.2d at 795 (it would

24

"eviscerate the collateral estoppel doctrine" to view preclusion as unavailable if the prior

decision is shown to be substantively incorrect).

Affirmed.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Korsmo, J.