# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| CODY HOLMES, an individual, | No.  57645-7-II |
| Appellant, | |
| v. | |
| CLALLAM COUNTY PUBLIC UTILITY DISTRICT NO. 1, | UNPUBLISHED OPINION |
| Respondent. | |

LEE, J. — Cody Holmes appeals the superior court's order granting summary judgment dismissal in favor of the Clallam County Public Utility District No. 1 (PUD) and dismissing his claims of wrongful termination/disability discrimination and failure to accommodate in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW.

Because collateral estoppel precludes Holmes' claim of wrongful termination/disability discrimination, we hold that the superior court did not err when it dismissed Holmes' wrongful termination/disability discrimination claim on summary judgment.  However, because there is a genuine issue of material fact as to whether the PUD failed to reasonably accommodate Holmes, the superior court erred in dismissing this claim on summary judgment.  Accordingly, we affirm the superior court's summary judgment dismissal of Holmes' wrongful termination/disability claim, but we reverse the superior court's summary judgment dismissal of Holmes' failure to accommodate claim and remand for further proceedings.

FACTS

A.    BACKGROUND

Holmes began working as a journeyman tree trimmer at the PUD in August 2017. Holmes was a member of the International Brotherhood of Electrical Workers Local No. 997 (IBEW). Throughout his employment, Holmes was a satisfactory employee and never received any disciplinary action.

Tree trimming is one of the most physically demanding jobs at the PUD. The job requires tree trimmers to be able to lift and carry up to 100 pounds. Tree trimming involves trimming tree limbs from an aerial bucket truck while leaning out of the bucket and holding chainsaws that can be six to eight feet long. Even though the saws are typically between 15 and 20 pounds, "it would feel more like about 70 pounds[,] 60 pounds when [one is] extended and reaching and cutting." Clerk's Papers (CP) at 218. Additionally, tree trimmers frequently drag ground brush, which can weigh up to 100 pounds. Tree trimmers cannot predict when and how they may need to lift or pull 100 pounds.

On May 20, 2019, Holmes injured his back while performing his job duties. He filed a workers' compensation claim with the Department of Labor and Industries (Department), which the Department approved. Due to his injury, Holmes was placed on medical leave, known as "injury subsidization," in accordance with the collective bargaining agreement (CBA) between the PUD and the IBEW. CP at 197.

Under the CBA, an injured employee can utilize injury subsidization for a maximum of 120 days. After 120 days, the injured employee may use family medical leave under the Family Medical Leave Act (FMLA). The FMLA provides "unpaid, job-protected" leave for up to 12

weeks within a 12-month period, provided that the employee worked at least 1,250 hours in the prior 12 months. CP at 385. After the exhaustion of FMLA leave, an employee may take up to five days of leave without pay (LWOP) during a calendar year. If an employee needs additional leave, LWOP may be converted into a "Leave of Absence," which is unpaid leave for up to six months, granted at the discretion of the PUD General Manager. CP at 333.

In November 2019, Holmes transitioned from injury subsidization to FMLA leave and received 12 weeks of leave.[1] Between January and February of 2020, Holmes intermittently worked lighter duty roles such as a pool flagger. Then, between February 6 and March 2, Holmes utilized his accrued paid time off (PTO). During his use of PTO, Holmes was briefly available for light duty work between February 25 and March 2. Between March 3 and March 9, Holmes took five days of LWOP. On March 9, the PUD terminated Holmes' employment.

During the termination meeting, Holmes requested a leave of absence for three weeks, specifically from March 9 through April 2, so that he could receive the third of a three-series epidural steroid injection (ESI) for his injury. Holmes' ESI was scheduled for March 23. The PUD emailed Holmes the applicable leave request form. Holmes applied for leave via email, which stated: "I am asking for a Leave of Absence in lieu of termination because I need a little more time. I need one more procedure before I can be fully released to return to my job of injury. The procedure is scheduled March 23 and requires 10 days off afterwards." CP at 503. The PUD denied Holmes' request.

---

[1] According to the PUD, Holmes did not qualify to receive a full 12 weeks of FMLA leave because he had not worked the requisite number of hours in the preceding 12 months.

From the time of Holmes' injury up until his termination, he was in frequent communication with the PUD. Holmes' physicians regularly submitted activity prescription forms (APFs) to the PUD documenting Holmes' recovery process and weight lifting restrictions. With each APF, Holmes' supervisor, Terry Lind, would assess whether there were lighter duty positions available for Holmes to fill until he fully recovered.

During the claims process, Holmes faced several delays in obtaining treatment. For instance, several medical providers recommended that Holmes get an MRI; however, the Department would not approve an MRI unless a neurosurgeon requested it. But multiple neurosurgeons would not agree to see Holmes as a patient until he obtained an MRI. Additionally, the ESI series Holmes received is typically administered in a three-shot series, one every 14 days. However, the Department would only approve one ESI at a time, and only every six weeks. Holmes ultimately hired an attorney to assist him in navigating the process.

The only light-duty position available to Holmes—meaning an available, open position that met the requirements of Holmes' work restrictions—was pool flagging. Pool flaggers needed to be able to lift and carry up to 40 pounds and stand for extended periods of time. Allegedly, Holmes expressed displeasure with pool flagging. Holmes apparently suggested to Lind that he would rather stay on leave than be a flagger. According to Holmes, he never stated that he did not wish to do flagging work. Holmes never turned down any light-duty work offered to him. Approximately two weeks before Holmes was terminated, Lind told Holmes that he "was tired of fighting for [Holmes] to help [him] keep [his] job." CP at 243.

The record is not clear if there were flagging positions available for Holmes between February 6, 2020, and March 2, 2020, but it appears that the PUD was waiting to clarify an APF

with Holmes' medical providers before offering him additional work. Two of Holmes' medical providers provided conflicting APFs on February 28: Dr. Andrew Thurman, Holmes' primary care provider, submitted an APF indicating that Holmes could perform modified duties for the month of March. A clinical note written by Dr. Thurman on February 28 stated: "Will advance restrictions to lift < 120 lbs, no activity restrictions other than lifting 3/2-28." CP at 104. However, Dr. Thurman's clinical note also stated that Holmes had ongoing issues with "[l]ow back pain," "[l]ow back strain," and "[l]umbar radiculopathy."[2] CP at 104. Additionally, Dr. Thurman wrote that Holmes "saw Dr. Jansen earlier today, who is advising another ESI," and that Holmes would "need time off after ESI." CP at 104. Dr. Thomas Jansen, the physician who recommended and oversaw Holmes' ESIs, submitted an APF that stated Holmes should not perform any work between February 28 and March 31.

On March 2, the PUD prepared a work restrictions memo consistent with Dr. Thurman's APF, which stated: "We have received updated instructions from your medical provider restricting your work activities from your recent injury. Currently we are able to return you to work with work restrictions on Monday, March 2, 2020." CP at 103. The memo further provided that Holmes could constantly lift or carry 50 pounds, but seldomly[3] lift or carry 100 pounds and never lift or carry up to 120 pounds. The restrictions applied until March 30. The PUD did not consider Holmes as fully released to work based on the restriction that Holmes could only seldomly lift or

---

[2] Lumbar radiculopathy occurs when there is compression of a spinal nerve root; it can cause lower back pain and leg weakness. *Radiculopathy*, MAYO CLINIC ORTHOPEDICS AND SPORTS MEDICINE, https://sportsmedicine.mayoclinic.org/condition/radiculopathy/ (last visited May 22, 2024).

[3] The memo defined "[s]eldom" as 0-1 hour per work day. CP at 103.

carry 100 pounds. Both Holmes and the PUD signed the memo acknowledging that Holmes agreed to the restrictions and accepted a "temporary, light duty position." CP at 103. The memo did not reference Dr. Jansen's APF.

Based on the restrictions in the March 2 memo, along with all the APFs that it had received, the PUD determined it could not accommodate Holmes and that Holmes's employment should be terminated. According to the PUD, it could have potentially accommodated Holmes if he had presented with a permanent work restriction. However, Holmes had only a temporary work restriction and he had not provided any supporting medical documentation that indicated a defined closure date of his injury. Lind had recommended to the PUD's general manager that Holmes not be granted a leave of absence because Holmes would likely require longer than a three-week recovery period after his third ESI. The record is not clear if Lind made this recommendation before or after Holmes' request for a leave of absence.

While Holmes had been on leave, the PUD had reorganized the tree trimming crews to compensate for Holmes' absence. Lind intended to hire a new apprentice tree trimmer in April 2022.

On March 9, Holmes was called into the PUD for a meeting and his employment was terminated. The PUD told Holmes he had no additional leave available and there was no open position he could fill based on his work restrictions. The PUD also informed Holmes that the possibility of a leave of absence had been previously discussed and that the general manager would deny one if Holmes requested additional leave. Nevertheless, the PUD told Holmes he was "more than welcome" to fill out a leave of absence request anyway. CP at 209.

The PUD Human Resources Manager, Jamie Spence, could not recall another instance in which the PUD denied a leave of absence to an employee. In the last five years, three other employees were granted leaves of absence based on occupational injuries. The first employee, Will Monzingo, presented with permanent work restrictions and could not return to his original position; Monzingo used the leave of absence to seek other employment. The second employee, Frank Ryan, also presented with permanent work restrictions that prevented return to his original position; Ryan used his leave of absence to transition into retirement. The third employee, Justin Houston, requested a leave of absence up until the date of a scheduled doctor's appointment, after which Houston received a full work release and could return to his original position.

On March 4, five days before the PUD terminated Holmes, the PUD posted six temporary part-time flagger positions. Three of the positions were set to start on April 16, with the remaining positions starting in June and July. The April and June flagger positions ended in October 2020.

A couple days before Holmes' third ESI, his appointment was cancelled due to the COVID pandemic. Holmes' ESI appointment was later rescheduled for May 4, and he received the injection then. Holmes did not fully recover after the third ESI. In June, a physician noted that Holmes' "pain level clearly precludes him from returning to any meaningful work until he finds a solution. He is clearly not able to return to his job of injury at this point." CP at 565-66. By July, Holmes was still experiencing "ongoing mid-line low back pain with burning and sharp pain" and his "pain [was] continuous." CP at 555. A July medical evaluation noted that "[h]eavy lifting particularly repetitively will cause the pain to be more intense." CP at 555. However, in September 2020, Holmes was fully released to return to work.

In November 2020, Dr. Thurman wrote a follow-up letter, which stated:

> At his office visit on 2/28/2020, Mr. Holmes was released to work on 3/2/2020 with restriction of lifting less than 120 lbs. and up to 50 lbs. constantly. This was consistent with his typical job duties (actually more than he would typically lift), so he was released to go back to his job of injury as of 3/2/2020. Based on his job description and exam he was able to return to work at that time.

CP at 109.

B.     GRIEVANCE ARBITRATION

On March 13, 2020, the IBEW filed a grievance on behalf of Holmes, claiming wrongful termination and that the PUD violated section 3.5 of the CBA.[4] The PUD denied the grievance, and the IBEW moved the grievance to arbitration. Prior to the arbitration hearing, the parties jointly stipulated to 83 facts and three conclusions of law/procedure. The conclusions of law/procedure stated:

> 1.      This Grievance is controlled by the [CBA], 2020-2023.
> 2.      The issue presented to the Arbitrator for resolution is: Was Cody Holmes terminated for just cause as required by Section 3.5 of the [CBA]? If not, what is the appropriate remedy?
> 3.      The Arbitrator's role is "limited to the interpretation of application of the express terms of [the CBA]."

CP at 187 (internal citations omitted) (third alteration in original).

The arbitration hearing took place on December 22. Holmes and the PUD had the opportunity to call witnesses and submit documents into evidence, and witnesses were subject to cross-examination. The parties submitted 86 exhibits into the record. After the hearing, both Holmes and the PUD submitted post-hearing briefs.

---

[4] Section 3.5 of the CBA provides: "[PUD] retains the right to exercise discipline in the interest of good service and the proper conduct of its business. However, except for employees who are in their orientation period and have no right of appeal, employees will not be disciplined or discharged except for cause." CP at 320.

On March 11, 2021, the arbitrator issued an opinion concluding that "Holmes was terminated for just cause as required by Section 3.5 of the [CBA]" and denied Holmes' grievance. CP at 175. In the written opinion, the arbitrator stated: "This case has not been presented as a disability case, an ADA case, or a Washington law against discrimination case. This case presents only the question whether [the PUD] had just cause to terminate [Holmes]." CP at 164. Additionally, the arbitrator made four explicit findings of fact: (1) "I find that [Holmes] knew or had reason to know that he could be terminated after his leave ran out"; (2) "I find that the [PUD] reasonably required that [Holmes] provide a full medical release before he could be returned to work"; (3) "I find that the [PUD] did not unreasonably or arbitrarily deny [Holmes'] request for a [leave of absence] for March 9, 2020 to April 2, 2020"; and (4) "I find that Cody Holmes was terminated for just case as required by Section 3.5 of the [CBA]." CP at 166, 170, 174, 175.

C.    SUPERIOR COURT PROCEEDINGS

On May 27, Holmes filed a complaint against the PUD for discrimination and wrongful termination and for failure to accommodate, all in violation of the WLAD.[5] Then, on August 2, 2022, the PUD moved for summary judgment dismissal on all of Holmes' claims.

On October 21, the superior court held a hearing on the PUD's summary judgment motion. During the hearing, the PUD argued that collateral estoppel, or issue preclusion, applied and that the issues established during Holmes' grievance arbitration defeated his claims. The PUD also argued that even if collateral estoppel did not apply, Holmes would still be unable to meet the elements of both his discrimination claim and his failure to accommodate claim.

---

[5] Holmes originally filed his complaint in Jefferson County. In June or July 2021, the PUD moved to transfer venue to Clallam County, which was granted.

On October 25, the superior court issued a memorandum opinion. The superior court concluded that collateral estoppel applied and that Holmes was precluded from relitigating facts established by the arbitrator. The superior court specifically identified two facts: "[B]y March 9, 2020, Mr. Holmes had not recovered sufficiently to obtain a full medical release; and that he was not ready to return to work in his job of injury on March 9 or for several months after March 9." CP at 41. Then, in the conclusion of the memorandum opinion, the superior court stated:

> The court concludes there is no genuine issue of material fact with regard to whether Mr. Holmes was medically cleared to return to work as of March 9, 2020, and the [PUD] is entitled to a judgment as a matter of law. On that issue, the [PUD]'s Motion for Summary Judgment is granted. When presented the court will sign an order consistent with this opinion.

CP at 41-42.

On November 7, Holmes moved for reconsideration, which the superior court denied. In the meantime, the PUD submitted a proposed order granting summary judgment dismissal of Holmes' claims to the superior court. The proposed order stated that there was no material issue of fact on any issue. Then, on November 18, Holmes filed a motion for a status conference pursuant to CR 16(a). Holmes sought to clarify the superior court's intent in its memorandum opinion because Holmes did not agree that the PUD's proposed order reflected the opinion.

On December 16, the superior court held a status conference. During the conference, the superior court stated:

> [M]y understanding was that I was finding that [Holmes] was collaterally estopped from asserting those factual issues that were resolved by the arbitrator. But I thought there was some—at least I thought in the background there were other . . . claims under the [WLAD]. . . .
>
> I mean, that was my understanding, that we were—I was granting summary judgment with regard to those factual issues that the arbitrator ruled on but that I

10

thought [Holmes] had indicated that there were other claims that might be filed or were filed.

Verbatim Rep. of Proc. (Dec. 16, 2022) at 49. The superior court then set the matter over to give the proposed order additional consideration. On December 30, the superior court held a final hearing, where it stated that it signed off on the proposed summary judgment order and added language that Holmes' claims as set forth in his May 2021 complaint were dismissed.

Holmes appeals the superior court's summary judgment order.

ANALYSIS

Holmes argues that the superior court erred when it dismissed his WLAD claims on summary judgment. Because collateral estoppel applies to judicial proceedings when issues were resolved in a prior arbitration, dismissal of Holmes' wrongful termination and discrimination claim on summary judgment based on collateral estoppel was proper. However, we reverse the superior court's dismissal of Holmes' failure to accommodate claim because issues of material fact exist.

A.    SUMMARY JUDGMENT AND WASHINGTON LAW AGAINST DISCRIMINATION PRINCIPLES

We review summary judgment orders de novo. *LaRose v. King County*, 8 Wn. App. 2d 90, 103, 437 P.3d 701 (2019). "Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014); CR 56(c). We consider all facts and make reasonable inferences in a light most favorable to the nonmoving party. *Id.*

Under the WLAD, an individual has the right to be free from discrimination due to disability. RCW 49.60.030(1); *see* RCW 49.60.010. "Disability" includes a cognizable or medically diagnosable physical impairment and can be permanent or temporary. RCW

11

49.60.040(7). It is unlawful for an employer to terminate an employee based on a physical disability. RCW 49.60.180(2).

A disabled individual may qualify for a reasonable accommodation in employment if an impairment is known or shown to exist and

> (i) The impairment must have a substantially limiting effect upon the individual's ability to perform his or her job . . . or
> (ii) The employee must have put the employer on notice of the existence of an impairment, and medical documentation must establish a reasonable likelihood that engaging in job functions without an accommodation would aggravate the impairment to the extent that it would create a substantially limiting effect.

RCW 49.60.040(7)(d); *accord Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 586, 459 P.3d 371 ("The WLAD gives employers an affirmative duty to accommodate an employee's disability."), *review denied*, 195 Wn.2d 1031 (2020).

The WLAD is liberally construed. RCW 49.60.020. Accordingly, summary judgment is often inappropriate in WLAD cases. *Gibson v. Costco Wholesale, Inc.*, 17 Wn. App. 2d 543, 556, 488 P.3d 869, *review denied*, 198 Wn.2d 1021 (2021). However, summary judgment can be "appropriate where the plaintiff fails to raise a genuine issue of material fact on one or more of the prima facie elements of a WLAD claim." *Id.*

B.     COLLATERAL ESTOPPEL

1.     Legal Principles

Collateral estoppel, or issue preclusion, "bars relitigation of an issue in a later proceeding involving the same parties."[6] *Schibel v. Eymann*, 189 Wn.2d 93, 99, 399 P.3d 1129 (2017). It

---

[6] Collateral estoppel is distinguishable from res judicata, or claim preclusion, which bars re-litigation of the same claim or cause of action. *Scholz v. Wash. State Patrol*, 3 Wn. App. 2d 584, 594, 416 P.3d 1261 (2018).

promotes judicial economy, provides finality in adjudications, and "precludes only those issues that were actually litigated and necessary to the final determination in the earlier proceeding." *Id.*

In claims of collateral estoppel, "the second claim is always different from the first." *Scholz v. Wash. State Patrol*, 3 Wn. App. 2d 584, 596, 416 P.3d 1261 (2018).  As such, there may be some difference in the ultimate issues between the claims. *Id.* at 596-97.  Nevertheless, "[w]hat matters is whether *facts* established in the first proceeding foreclose the second claim." *Id.* at 597 (emphasis in original).  We review de novo the application of collateral estoppel. *Billings v. Town of Steilacoom*, 2 Wn. App. 2d 1, 14, 408 P.3d 1123 (2017), *review denied*, 190 Wn.2d 1014 (2018).

Collateral estoppel applies to judicial proceedings when issues were resolved in a prior arbitration. *Id.* at 16.  The party asserting collateral estoppel must demonstrate

> (1) the issue in the earlier proceeding is identical to the issue in the later proceeding, (2) the earlier proceeding ended with a final judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party, or in privity with a party, to the earlier proceeding, and (4) applying collateral estoppel would not be an injustice.

*Schibel*, 189 Wn.2d at 99.  Courts also consider additional factors within the "injustice" prong of the collateral estoppel test. *Scholz*, 3 Wn. App. 2d at 595.  Those factors are: (1) whether the issue was within the scope of the arbitration; (2) differences between arbitration and court proceedings; and (3) public policy considerations. *See id.* at 595-96; *see also Billings*, 2 Wn. App. 2d at 15 ("'Washington courts focus on whether the parties to the earlier proceeding had a full and fair hearing on the issue.'" (internal quotation marks omitted) (quoting *Hadley v. Maxwell*, 144 Wn.2d 306, 311, 27 P.3d 600 (2001))).

2.       Collateral Estoppel Applies

Holmes argues that "[i]t is settled that arbitration of contract-based claims pursuant to a CBA cannot preclude statutory discrimination claims."  Br. of Appellant at 14.  Additionally, Holmes asserts that the "issue" of whether the PUD had just cause to terminate him was "separate and distinct" from the issue of whether the PUD had discriminatory animus.  Br. of Appellant at 21.

As a threshold matter, it appears Holmes conflates collateral estoppel with res judicata.  Collateral estoppel applies even when "a different claim or cause of action is asserted."  *Scholz*, 3 Wn. App. 2d at 594.  Furthermore, collateral estoppel is concerned with "'limiting the relitigation of *factual issues*.'"  *Id.* (emphasis added) (quoting 14A KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 35:33, at 552-53 (2d ed. 2009)).

The PUD does not argue that Holmes is precluded from bringing his WLAD claims; rather, the PUD argues that the facts established at the grievance arbitration foreclose Holmes' WLAD claims.  We acknowledge that some of the ultimate issues raised differ between the arbitration and the case now on appeal.  However, that is separate from whether the facts established at arbitration preclude Holmes' current claims.  *Id.* at 597.

Here, the parties to the grievance arbitration and subsequent litigation are the same.  *See Billings*, 2 Wn. App. 2d at 18 ("In a labor arbitration proceeding, a union represents a plaintiff-employee.  When an employee's interest is represented by his union, he is in privity with the union.").  Additionally, the arbitration ended in a final judgment on the merits.  Furthermore, applying collateral estoppel would not be an injustice: during the grievance arbitration, both parties had "full opportunity" to call witnesses and cross-examine them, "submit documents into evidence

14

and to make arguments," and submit extensive exhibits and post-hearing briefs. CP at 158. The single issue during the arbitration was whether Holmes was terminated for just cause, which the parties agreed was properly within the scope of the arbitration. Accordingly, Holmes had a full and fair hearing on the issue. *Billings*, 2 Wn. App. 2d at 15.

Finally, the issues are identical. Again, the issue during arbitration was whether Holmes was terminated for just cause. The arbitrator concluded that Holmes was terminated for just cause. To do so, the arbitrator made several findings of fact based on the evidence presented during the hearing, which included: "[Holmes] knew or had reason to know that he could be terminated after his leave ran out"; "the [PUD] reasonably required that [Holmes] provide a full medical release before he could be returned to work"; and "the [PUD] did not unreasonably or arbitrarily deny [Holmes'] request for a [leave of absence] for March 9, 2020 to April 2, 2020." CP at 166, 170, 174. The arbitrator further determined that Holmes "could not have safely returned to work on March 9 or on April 2, 2020."[7] CP at 170. These are legitimate, non-discriminatory reasons for Holmes' termination that have "already been litigated." *Billings*, 2 Wn. App. 2d at 25. Had Holmes been fully released to return to work without restrictions on March 9, the arbitrator necessarily could not have determined that Holmes was terminated for just cause. Therefore, "[t]his issue is identical to an issue that is the crux of this cause of action." *Id.* A finding that Holmes was terminated for cause precludes a finding that Holmes was terminated based on discrimination. Accordingly, the superior court did not err when it applied collateral estoppel to Holmes' claim for wrongful discrimination/termination.

---

[7] Holmes himself acknowledged his work restrictions by signing the March 2, 2020 memo.

Moreover, even if Holmes is not collaterally estopped and is able to establish a prima facie case of discrimination, he fails to show that the reason for his discharge was pretextual. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 527, 404 P.3d 464 (2017).

Discriminatory intent under WLAD can be difficult to prove, so plaintiffs often must rely on circumstantial, indirect, and inferential evidence to establish discriminatory action. *Id*. at 526. In such cases, courts rely on the *McDonnell Douglas*[8] burden-shifting framework. *Id.*

There are three steps in the *McDonnell Douglas* framework. *Id.* at 527. The plaintiff must first make a prima facie showing of discrimination. *Id.* Once the plaintiff makes a prima facie showing of discrimination, the burden shifts to the defendant employer to articulate a non-discriminatory reason for the plaintiff's discharge. *Id.* If the employer establishes a non-discriminatory reason for the discharge, the burden shifts back to the plaintiff to produce evidence showing that the reason for discharge was a pretext. *Id.*

Holmes argues that the PUD's decision to deny him a leave of absence, prior to his even requesting a leave of absence, is evidence that the PUD's articulated reason for Holmes' termination is pretextual. Here, Holmes' argument assumes that the PUD's reason for terminating him was that he did not provide sufficient medical documentation that he only needed a three-week leave of absence. It is true that the PUD had noted it "had not received supporting documentation from any physicians that showed . . . a defined closure date of when [Holmes] would be returned to the job of injury." CP at 208. However, the record shows that this was merely information that bolstered the PUD's decision, which was actually based on the fact that

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Holmes had exhausted all of his leave. Indeed, Holmes' own understanding of why he had been terminated was because he had no remaining leave and there were no light-duty positions available. The record also shows that Holmes was not entitled to a leave of absence per the terms of the CBA. The PUD's general manager had the discretion to deny Holmes' leave request. Further, the record suggests that there were no open lighter duty positions for which Holmes was qualified at the time of his termination. Therefore, the PUD's reasoning had a basis in fact.

Holmes also argues the fact that he was the only PUD employee to have been denied a leave of absence is evidence that the PUD's reason was substantially motivated by discrimination. Here, the record shows that prior to Holmes, three other employees requested and were granted leaves of absence after exhausting their available leave. However, their circumstances can be distinguished from Holmes'. Two of those employees presented with permanent work restrictions; one used leave to find other employment while the other transitioned to retirement. The third employee requested a leave of absence up until the date of a scheduled doctor's appointment, after which he received a full work release and could return to his original position.

While Holmes had an appointment scheduled for his third ESI when he requested the leave of absence—setting aside the fact that it was later cancelled and postponed—based on the APFs the PUD had received, it was not clear that the ESI would result in a full work release, i.e., a clear return date, for Holmes. This was not a circumstance where Holmes was recovered and simply waiting on a physician sign-off; he was waiting on an important procedure that, the record shows, did not immediately alleviate his injury. Additionally, unlike the two employees who had permanent restrictions and transitioned outside the PUD, Holmes hoped to utilize the leave of absence in anticipation of an eventual full release to return to work. Moreover, at the time of

Holmes' request for a leave of absence, the PUD had received conflicting APFs from Holmes' medical providers regarding the extent of his work restrictions. What the two APFs did agree upon, however, was that Holmes was not released to work without restriction. Accordingly, Holmes fails to show that he was treated in a disparate manner suggesting discrimination.

Holmes further argues that he was released to return to work by March 9, 2020, based on Dr. Thurman's November 2020 letter. But this argument is contrary to the evidence. The November 2020 letter does not state that Holmes was released to constantly lift 100 pounds. While the November 2020 letter may be read, as Holmes asserts, as requiring no work restrictions other than no lifting more than 120 pounds, such an interpretation is not reasonable in light of the other evidence in the record. For instance, Holmes signed the PUD's return to work memo on March 2, 2020, in which Holmes acknowledged he had work restrictions requiring a "temporary, light duty position" because he could constantly lift or carry 50 pounds, but seldomly[9] lift or carry 100 pounds, and never lift or carry up to 120 pounds. CP at 103. The return to work memo was consistent with Dr. Thurman's recommended restrictions in February 2020. Indeed, Dr. Thurman's February 28, 2020 clinical note stated that Holmes had ongoing problems with low back pain, low back strain, and lumbar radiculopathy. Dr. Thurman also noted in February 2020 that Holmes would need to take additional time off following the ESI recommended by Dr. Jansen. Holmes did not provide any medical documentation that indicated a defined closure date of his injury.[10] Thus, even when the evidence is viewed in a light most favorable to Holmes, a reasonable

---

[9] The memo defined "[s]eldom" as 0-1 hour per work day. CP at 103.

[10] During the grievance arbitration in December 2020, when Holmes was asked whether he received a full release to return to work 10 days after the ESI, Holmes evaded the question.

inference arises that all parties understood—and that Holmes agreed—Holmes still had work restrictions that prevented his return to work as a tree trimmer at the time of his termination in March 2020.[11]

Even when Dr. Thurman's November 2020 letter is viewed in a light most favorable to Holmes, based on the record, Dr. Thurman's November 2020 letter is more reasonably interpreted as consistent with his February 28, 2020 APF, which stated that Holmes could only seldomly lift 100 pounds. Again, the November 2020 letter says nothing of whether Holmes could lift up to 100 pounds constantly, which was the release the PUD was looking for to allow Holmes to return to his position as a tree trimmer. Holmes fails to present any evidence to negate this fact.[12]

Because collateral estoppel applies and because Holmes does not present any evidence that the PUD's reason for discharging him was pretextual, we hold that the superior court did not err when it dismissed Holmes' disability discrimination claim on summary judgment.

D.    FAILURE TO ACCOMMODATE

Holmes argues there are issues of material fact regarding the PUD's accommodation of his injury that preclude summary judgment dismissal. We agree.

---

[11] We note that Holmes' medical assessments following his termination indicate that Holmes was still in considerable pain. In June 2020, a physician noted that Holmes' "pain level clearly precludes him from returning to any meaningful work until he finds a solution. He is clearly not able to return to his job of injury at this point." CP at 565-66. In July 2020, Holmes was still experiencing "ongoing mid-line low back pain with burning and sharp pain" and his "pain [was] continuous." CP at 555. A medical evaluation stated that "[h]eavy lifting particularly repetitively will cause the pain to be more intense." CP at 555.

[12] Indeed, the record shows that Holmes did not obtain a full work release until several months after his termination.

1.      Legal Principles

Under the WLAD, employers have a duty to reasonably accommodate an employee's disability "unless it 'would impose an undue hardship on the conduct of the employer's business.'" *Gamble v. City of Seattle*, 6 Wn. App. 2d 883, 889, 431 P.3d 1091 (2018) (quoting *Doe v. Boeing Co.*, 121 Wn.2d 8, 18, 846 P.2d 531 (1993)), *review denied*, 193 Wn.2d 1006 (2019); *see generally* RCW 49.60.180. "'A reasonable accommodation envisions an exchange between employer and employee, where each party seeks and shares information to achieve the best match between the employee's capabilities and available positions.'" *Brownfield v. City of Yakima*, 178 Wn. App. 850, 876, 316 P.3d 520 (2014) (quoting *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 779, 249 P.3d 1044, *review denied*, 172 Wn.2d 1013 (2011)). The crux of the employer's duty is to help the employee keep working, either "at the existing position or through attempts to find a position compatible with [his or her] limitations." *Griffith v. Boise Cascade, Inc.*, 111 Wn. App. 436, 442, 45 P.3d 589 (2002).

To survive summary judgment, an employee must demonstrate a genuine issue of material fact as to the prima facie elements of failure to accommodate. *See Gibson*, 17 Wn. App. 2d at 556. An individual who claims that their employer failed to accommodate must show "that (1) the employee suffered from a disability, (2) the employee was qualified to do the job at issue, (3) the employee gave his or her employer notice of the disability, and (4) the employer failed to reasonably accommodate that disability." *Mackey*, 12 Wn. App. 2d at 586. An employee is not entitled to a specific accommodation, nor must an employer "remove or modify the essential functions of a position to accommodate an employee." *Griffith*, 111 Wn. App. at 444; *accord*

*Mackey*, 12 Wn. App. 2d at 586 ("Where multiple potential methods of accommodation exist, the employer is entitled to select the appropriate method.").

    2.       Holmes Raises Genuine Issue of Material Fact

Holmes argues that because the PUD had posted several open pool flagger positions at the time of his termination, and had neither informed him of those open positions nor offered them as an accommodation, raises an issue of fact as to whether the PUD failed to reasonably accommodate him.  The PUD argues that (1) nothing in the record indicates that Holmes was qualified for any of the pool flagger postings; (2) the flagger positions did not begin until a month after Holmes' termination; and (3) reassignment as a part-time pool flagger is not a reasonable accommodation for a full-time tree trimmer.  We agree with Holmes.

The record shows that Holmes was disabled under the WLAD.  RCW 49.60.040(7).  Additionally, the PUD had notice of Holmes' disability.  The primary physical requirement of pool flagging is that pool flaggers need to be able to lift and carry up to 40 pounds.  The record also shows that at the time of Holmes' termination, he could lift and carry up to 40 pounds without restriction.  The PUD's March 2, 2020, memo to Holmes stated:

> We have received updated instructions from your medical provider restricting your work activities from your recent injury. . . .
>
> . . . .
>
> You are permitted to work with the following restrictions:
>
> - Lifting, carrying, pushing or pulling up to 120 pounds - Never
> - Lifting, carrying, pushing or pulling up to 100 pounds - Seldom (1-10%, 0-1 hour)
> - Lifting, carrying, pushing or pulling up to 80 pounds - Occasional (11-33%, 1-3 hours)

- Lifting, carrying, pushing or pulling up to 60 pounds - Frequent (34-66%, 3-6 hours)
- Lifting, carrying, pushing or pulling up to 50 pounds - Constant (67-100%, Not restricted)

CP at 103. This memo is also supported by Dr. Thurman's February 28, 2020 clinical note, which stated, "Will advance restrictions to lift < 120 lbs, no activity restrictions other than lifting 3/2-28." CP at 104. Furthermore, in January and February of 2020, Holmes worked several shifts as a pool flagger. Viewed in a light most favorable to Holmes, a reasonable inference arises that Holmes was qualified for the posted pool flagging positions.

Additionally, the PUD's memo to Holmes stated, "Currently we are able to return you to work with work restrictions on Monday, March 2, 2020." CP at 103. The memo also stated, "[I]f you agree to the restrictions and accept the temporary, light duty position, please sign below." CP at 103. Holmes signed the memo, as did Lind. Based on the plain language of the PUD's March memo, along with both Holmes' and Lind's signatures, it would appear the PUD was prepared to offer Holmes lighter duty work the week before it terminated him. However, the record then shows that within a matter of days, the PUD switched its stance: the PUD discussed internally whether it would offer Holmes leave without pay, but it did so before Holmes had even requested the leave. Holmes' direct supervisor, Lind, recommended that Holmes not be granted leave without pay. Holmes testified that during his termination meeting on March 9, the reasoning the PUD gave to him for the termination was that the "[PUD] had nothing for [Holmes]. They had no way to code [him] on the books any more for any more leave. They had ratepayers." CP at 237.

The record also shows that Holmes was still employed when the PUD posted the pool flagger positions. Further, Holmes never turned down any light duty work when it was previously

22

offered. The WLAD contemplates an exchange between the employer and employee "'where each party seeks and shares information to achieve the best match between the employee's capabilities and available positions.'" *Brownfield*, 178 Wn. App. at 876 (quoting *Frisino*, 160 Wn. App. at 779). The record is devoid of evidence that the PUD exchanged information with Holmes about the posted flagger positions. Furthermore, the record shows that the PUD did *not* offer Holmes additional flagger positions after February 2020. Lind even stated, "[Holmes] did not care to come in and flag." CP at 226-27.

As to the PUD's argument that the pool flagger positions started a month after Holmes was terminated and after Holmes' leave of absence request would have expired, a question arises as to why Holmes could not have utilized a leave of absence until the positions became available. The record shows that under the CBA, a leave of absence may be granted for up to six months. Indeed, two of the prior employees who had taken leaves of absence used their leave to undergo transitions. Moreover, the PUD told Holmes that his request for leave would not be approved prior to his even requesting it. Finally, the PUD fails to support its contention that a part-time pool flagging position is not an appropriate or reasonable accommodation for a full-time tree trimmer. The PUD's argument contradicts the employer's duty to "attempt[] to find a position compatible with [the employee's] limitations." *Griffith*, 111 Wn. App. at 442. If pool flagging was the compatible position, then it is a reasonable accommodation. The PUD has also failed to show that reassigning Holmes as a pool flagger would have created an undue burden. *Id.* at 443.

Viewing all facts and reasonable inferences in a light most favorable to Holmes, the PUD failed to engage in any way in an exchange with Holmes about reasonable accommodations. Accordingly, Holmes has met his burden to create a genuine issue of material fact as to whether

the PUD failed to reasonably accommodate him. Because there is a genuine issue of material fact as to whether the PUD reasonably accommodated Holmes, the superior court erred in granting summary judgment dismissal of Holmes' failure to accommodate claim.

## CONCLUSION

We affirm the superior court's summary judgment dismissal of Holmes' wrongful termination/disability discrimination claim, but we reverse the summary judgment dismissal of Holmes' failure to accommodate claim and remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, J.

Veljacic, A.C.J.